J-S07015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                            :                 PENNSYLVANIA
                                            :

                 v.                                   :
                                            :

                                            :

JULIUS L. ALLEN                         :
                                            :

                     Appellant                 :      No. 785 MDA 2024

Appeal from the PCRA Order Entered March 27, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0005672-2018

BEFORE: NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY NICHOLS, J.:         **FILED: JULY 21, 2025**

Appellant Julius L. Allen appeals *pro se* from the order denying his Post Conviction Relief Act[1] (PCRA) petition following a hearing. On appeal, Appellant argues that PCRA counsel was ineffective for failing to locate an alibi witness for purposes of the PCRA hearing. Following our review, we vacate and remand for further proceedings.

A prior panel of this Court summarized the underlying facts of this matter as follows:

> Lashauna Thornton had been residing at 1309 Berryhill Street in the City of Harrisburg with Iesha Green and Kevin Royster for approximately two (2) months. On September 27, 2018, an argument occurred over the payment of household bills. Having decided to move out of the residence, Thornton went to the house the next day to retrieve her belongings. With her was [Appellant], a close friend, and a friend of his only known to her as Squeegee.

---

[1] 42 Pa.C.S. §§ 9541-9546.

When they arrived at 1309 Berryhill Street, Thornton went into the house alone and retrieved her belongings without incident. Her intention was to simply drive away.

However, [Appellant] began yelling to Green and Royster, who were inside the house, to come outside to fight him. Presumably intended for Royster, who was from Philadelphia, [Appellant] yelled "that Philly n----r, he a b----h." [Appellant] would not quiet down despite Thornton's repeated instructions for him to "shut up."

In response to the ongoing shouting, Green and Royster exited the house through their back door and saw that it was [Appellant] causing the commotion. [Appellant] stated to Royster that he was "going to choke [him] the f--k out" and proceeded to do so as Royster attempted to walk away. A fight ensued between [Appellant], Royster[,] and Green; with each giving and receiving various blows. At some point, Royster freed himself from the scuffle and retrieved a knife from inside the house. However, he returned it without having used it when instructed to do so by Green. During the fighting, [Appellant] suffered injuries which were described as his mouth being "busted." The fighting finally subsided when Green's mother arrived on scene, separated everyone, and told [Appellant] and Thornton to leave. [Appellant] later told Thornton that before leaving[,] he shouted to Green and Royster that he "would be back."

After dropping off Squeegee, [Appellant] and Thornton drove to [Appellant's] grandmother's house in Mechanicsburg. Once there, [Appellant] told Thornton he wanted to go back to fight Royster. [Appellant] retrieved a shotgun, a jacket in which he wrapped the shotgun and gloves, all of which he put in the backseat of Thornton's car. He instructed Thornton to drive back to the area of the alley behind 1309 Berryhill Street, and she did so. Once back at the location, [Appellant] retrieved the shotgun from the back seat and walked to an open area between two (2) row homes. He returned shortly thereafter without the shotgun, got back in the car[,] and instructed Thornton to drive to his friend's house.

When they arrived, [Appellant] did not exit the vehicle but yelled to his friend to "meet him." He then directed Thornton to drive him to another house where his cousin lived. When Thornton dropped [Appellant] at his cousin's house, he gave her his cell phone and instructed her to answer it when it rang. Thornton

drove to a Burger King on Paxton Street where she ordered food and ate by herself. Security camera video established that Thornton was, in fact, at Burger King eating all alone.

[Appellant] proceeded without Thornton to a local informal drinking establishment known as the Speakeasy and met up with Joseph Cole, a family friend he had known for over twenty (20) years. Cole was also an acquaintance of Royster and knew him to be from Philadelphia. Cole noticed that [Appellant] was sweating a lot, had a swollen and bloody lip and [Appellant] told him "he got into something with a Philly dude." [Appellant] also told Cole that he hid a gun in an alley, and he asked Cole to go with him to see the person from Philadelphia. When Cole refused to participate, [Appellant] left and said he would be back.

[Appellant] returned to the Speakeasy fifteen (15) minutes later. He told Cole that he shot somebody and left the gun at the scene. [Appellant] asked Cole if he could use his phone because he did not have his. Cole could hear through the phone that [Appellant] called a female and asked to be picked up. The female unknown to Cole said that she was at Burger King. When Cole later heard that Royster had been shot, he called [Appellant] and asked him what he had done. [Appellant] told Cole not to discuss it on the phone.

When she received the call from [Appellant] on Cole's phone, Thornton left Burger King to pick him up at his cousin's house as he requested her to do. After picking up [Appellant], he told Thornton to drive to an apartment complex on the South Side of Harrisburg where he entered an apartment and remained inside for approximately thirty (30) minutes. They then drove to Steelton where [Appellant] gave his cousin a bag with the clothes he had been wearing and told him to burn them.

[Appellant] and Thornton then returned to [Appellant's] grandmother's house in Mechanicsburg. When they arrived, [Appellant] told Thornton and his grandmother that he went to 1309 Berryhill Street, kicked in the door, and engaged in a "tussle" with Royster. He said that Royster had just come out of the shower, and that [Appellant] pulled the trigger as they struggled over the gun. [Appellant] left the gun at the scene and left Royster injured and "bleeding out" from a gunshot wound. When [Appellant's] grandmother told him he had to leave, he and Thornton drove to [Appellant's] mother's home in Harrisburg.

- 3 -

Before parting ways with Thornton, [Appellant] told her not to speak with the police.

When police officers responded to the call of shots fired at 1309 Berryhill Street and made entry into the residence, they discovered blood all over the kitchen floor. Kevin Royster was found collapsed against the front door with a large shotgun wound in his right thigh. He was completely naked. He was pronounced dead at the scene.

Officers with the Harrisburg Police forensic unit discovered that the strike plates were knocked off the front door of the house, consistent with the door having been kicked in. They also noticed moisture in the bathroom as if someone had just taken a shower.

Much of the evidence adduced at trial was corroborated by historical data recovered from [Appellant's] cell phone. The process of obtaining and analyzing this data was explained by FBI Agent William Shute.[fn1] By way of illustration, [Appellant's] phone was found to be at the following locations on September 28, 2018:

(a)   11:30 a.m. - 5:20 p.m.—at [Appellant's] mother's residence;

(b)   6:12 p.m. - 6:42 p.m.—at 1309 Berryhill Street, corresponding to the general time of the initial fight between [Appellant] and Royster;

(c)   7:12 p.m. - 7:26 p.m.—at [Appellant's] grandmother's home, corresponding to the trip to her house following the fight when [Appellant] retrieved the shotgun;

(d)   7:46 p.m.—in the area of the alley behind 1309 Berryhill Street, corresponding to when [Appellant] hid the shotgun;

(e)   7:55 p.m. - 8:40 p.m.—at Burger King, corresponding to the time when Thornton had [Appellant's] phone and ate at Burger King alone waiting for a phone call;

(f)   9:02 p.m. - 9:30 p.m.—at Hooveter Homes on the South Side of Harrisburg where [Appellant] entered an apartment without Thornton;

[fn1] Agent Shute was admitted as an expert in historical call detail records and geolocation data with neither examination on his credentials nor objection by [Appellant].

Although precise times were not testified to, [Appellant's] phone then proceeded to Steelton where [Appellant] discarded his clothes to be burned and then back to his grandmother's house in Mechanicsburg.

*Commonwealth v. Allen*, 147 MDA 2021, 2021 WL 4901479, *1-3 (Pa. Super. filed Oct. 21, 2021) (quoting Trial Ct. Op., 3/24/21, at 2-6).

Appellant was ultimately convicted of murder and burglary following a jury trial in 2020. On December 13, 2020, the trial court sentenced Appellant to a mandatory term of life imprisonment with a consecutive term of ten to twenty years' imprisonment. On direct appeal, this Court affirmed Appellant's judgment of sentence and our Supreme Court denied further review. *See Allen*, 2021 WL 4901479 at *7, *appeal denied*, 620 MAL 2021 (Pa. filed April 26, 2022).

On June 26, 2023, Appellant filed a timely *pro se* PCRA petition in which he claimed that trial counsel was ineffective for failing to file an alibi notice and investigate "Squeegee," who would have testified that Appellant was not at the scene when the crime occurred. *Pro Se* PCRA Pet., 6/26/23, at 3 (unpaginated). The PCRA court subsequently appointed Kristen Wesenberger, Esq. (PCRA counsel), who filed a motion to withdraw and a *Turner*/*Finley*[2] no-merit letter. Therein, PCRA counsel explained that private investigator

---

[2] *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988); *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

John Harlacker had been unable to obtain Squeegee's contact information or verify that he would have been an alibi witness for Appellant. *See* Mot. to Withdrawal, 1/25/24, at 6 (unpaginated). In any event, PCRA counsel noted that both Ms. Thornton's trial testimony and the historical cell phone data presented to the jury established that Appellant was not with Squeegee at the time of the murder. *Id.* at 9.

The PCRA court scheduled a hearing on PCRA counsel's motion to withdraw. In its order, the PCRA court noted that because PCRA counsel's no-merit determination was based on the inability to locate Squeegee or produce him as a witness, all reasonable efforts be made to locate Squeegee to testify at the hearing. *See* PCRA Ct. Order, 1/29/24.

The PCRA court conducted a hearing on March 25, 2024. At that time, PCRA counsel presented testimony from private investigator Mr. Harlacker, who stated that he obtained Squeegee's birthdate and real name, Ajajuan McWhite, from the detective who handled Appellant's case. *See* N.T. PCRA Hr'g, 3/26/24, at 5-6. Mr. Harlacker explained that he ran McWhite's name and birthdate through a national database and was able to discover two recent physical addresses, a phone number, and an email address. *See id.* at 6. Mr. Harlacker stated that he attempted to contact McWhite at the phone number and email address listed in the database, but did not receive a response. *Id.* at 6-7. Mr. Harlacker also testified that he had visited both physical addresses. *Id.* at 6. At one address, Mr. Harlacker stated that he spoke with a woman whose sister lived at the residence for four years and stated that the

witness was unknown to her. *Id.* Mr. Harlacker indicated that he "provided her with a business card and advised that [the witness] was not in trouble" and that they were looking for him as a witness. *Id.* He also testified that he visited the second address, which appeared to be the witness' mother's residence, and ultimately left a business card because no one answered the door. *Id.*

On March 27, 2024, the PCRA court issued an order and opinion granting PCRA counsel's motion to withdraw and dismissing Appellant's PCRA petition. *See* Order & Op., 3/27/24. Therein, the PCRA court explained that although Appellant sought to challenge trial counsel's failure to present an alibi witness at trial, he failed to meet "his burden of establishing that the witness in question is still living, or 'currently exists,' that he was available at trial to testify for the defense, or that he was willing to testify for the defense." *Id.* at 3 (unpaginated).

Appellant filed a timely notice of appeal.[3] In lieu of a Pa.R.A.P. 1925(a) opinion, the PCRA court issued a memorandum statement adopting its prior opinion and order denying Appellant's PCRA petition.

_____

[3] In its memorandum statement, the PCRA court noted that it was unclear when Appellant filed his notice of appeal and whether it was timely filed. Mem. Statement, 6/10/24, at 1 n.1 (unpaginated). However, the trial court docket reflects that although the March 27, 2024 order was served on PCRA counsel, who was permitted to withdraw, there is no indication that the March 27, 2024 PCRA order was served on Appellant, who is *pro se*. ***See Commonwealth v. Midgley***, 289 A.3d 1111, 1117 (Pa. Super. 2023) (stating that "[w]here the trial court docket in a criminal case does not indicate service on a party or the
*(Footnote Continued Next Page)*

On appeal, Appellant raises the following issue for review:

Did PCRA counsel violate her duty to continue to represent the Appellant until the court ruled on her petition to withdraw.

Appellant's Brief at 2.

Appellant argues that PCRA counsel was ineffective for failing to locate McWhite and present him as a witness at the PCRA hearing. In support, Appellant includes a letter from Appellant's cousin, who explained that he visited McWhite at his mother's residence and confirmed that McWhite would be willing to testify on Appellant's behalf. *Id.* at 5-6. Appellant asserts that his claim has arguable merit because PCRA counsel failed to issue a subpoena for McWhite at his mother's residence, which was evidence that PCRA counsel was not advocating on his behalf. *Id.* at 6-7. Further, Appellant claims that PCRA counsel had no reasonable basis for failing to call McWhite as a witness, as she knew or should have known that McWhite's testimony was the critical factor for the evidentiary hearing and PCRA counsel failed to procure a subpoena. *Id.* at 6-7. Finally, Appellant contends that the absence of McWhite's testimony was so prejudicial that it denied Appellant's right to a fair PCRA hearing. *Id.* at 7. Therefore, Appellant requests that we remand this matter to the PCRA court for further proceedings. *Id.*

---

date of service, we will not quash the appeal or require further proceedings. Rather, we will treat the time in which to take an appeal as never having started to run and treat the appeal as timely"). Therefore, we will treat Appellant's notice of appeal as timely filed.

Our review of the denial of PCRA relief is limited to "whether the record supports the PCRA court's determination and whether the PCRA court's decision is free of legal error." **Commonwealth v. Lawson**, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." **Commonwealth v. Mitchell**, 105 A.3d 1257, 1265 (Pa. 2014) (citation omitted); **see also Commonwealth v. Davis**, 262 A.3d 589, 595 (Pa. Super. 2021) (stating that "[t]his Court grants great deference to the findings of the PCRA court if the record contains any support for those findings" (citation omitted)).

With respect to ineffectiveness claims, our Supreme Court has explained:

> Counsel is presumed to be effective and it is a petitioner's burden to overcome this presumption by a preponderance of the evidence. To succeed on a claim of ineffective assistance of counsel, a petitioner must establish three criteria: (1) that the underlying claim is of arguable merit; (2) that counsel had no reasonable basis for his or her action or inaction; and (3) that petitioner was prejudiced as a result of the complained-of action or inaction. The failure to satisfy any one of these criteria is fatal to the claim. To establish prejudice in the context of this standard, a petitioner must establish that there is a reasonable probability that the result of the proceeding would have been different but for the complained-of conduct.

**Commonwealth v. Thomas**, 323 A.3d 611, 620-21 (Pa. 2024) (citations omitted).

In **Bradley**, our Supreme Court "h[e]ld that a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." **Commonwealth v. Bradley**, 261 A.3d 381, 401 (Pa. 2021). However, this Court has explained that "**Bradley** did not guarantee a PCRA petitioner substantive review of claims of PCRA counsel's ineffectiveness, nor did it create an absolute right to remand for development of those claims." **Commonwealth v. Lawrence**, 309 A.3d 152, 155 (Pa. Super. 2024).

Rather, when this Court is presented with a **Bradley** claim, we determine whether remand is appropriate pursuant to the following guidelines:

> In some instances, the record before the appellate court will be sufficient to allow for disposition of any newly-raised ineffectiveness claims. However, in other cases, the appellate court may need to remand to the PCRA court for further development of the record and for the PCRA court to consider such claims as an initial matter. Consistent with our prior case law, to advance a request for remand, a petition would be required to provide more than mere boilerplate assertions of PCRA counsel's ineffectiveness; however, where there are material facts at issue concerning claims challenging counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded.

**Commonwealth v. Parrish**, 273 A.3d 989, 1002 (Pa. 2022).

Here, the PCRA court concluded that Appellant was not entitled to PCRA relief because he had "not met his burden of establishing that the witness in question is still living, or 'currently exists,' that he was available at trial to

- 10 -

testify for the defense, or that he was willing to testify for the defense." **See** Order & Op., at 3 (unpaginated).

However, on appeal, Appellant claims that his cousin spoke with McWhite at one of the addresses identified by Mr. Harlacker, that McWhite indicated that he was willing to testify on Appellant's behalf, and that PCRA counsel was ineffective for failure to procure a subpoena for McWhite at that location. **See** Appellant's Brief at 6-8. Further, Appellant has "provide[d] more than mere boilerplate assertions of PCRA counsel's ineffectiveness" and has instead demonstrated that "there are material facts at issue concerning claims challenging counsel's stewardship[.]" **See Parrish**, 273 A.3d at 1002; **see also Lawrence**, 309 A.3d at 156 (concluding remand is appropriate where PCRA court's conclusions are insufficient for this Court to conduct proper appellate review of the appellant's **Bradley** claims); **cf. Commonwealth v. Cisne,** 632 EDA 2024, 2025 WL 1662815 at *6 (Pa. Super. filed June 12, 2025) (concluding that remand was unnecessary because "[a]part from suggesting that PCRA counsel was ineffective merely for filing a 'no merit' letter, [the appellant failed] to advance anything other than boilerplate assertions of ineffectiveness").[4].

On this record, we cannot determine whether Appellant's underlying claim of trial counsel's ineffectiveness would have otherwise been meritorious if not for PCRA counsel's alleged failure to call McWhite as a witness before

_____

[4] Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value pursuant to Pa.R.A.P. 126(b).

- 11 -

the PCRA court. Further, "[i]t is not an appellate court's function to engage in factfinding." **Commonwealth v. Shaw**, 247 A.3d 1008, 1017 (Pa. 2021) (citation omitted). Therefore, because the PCRA court is "the appropriate—and, indeed, the only—forum for the evidentiary and factual development," we conclude that remand is necessary for the PCRA court to address Appellant's claim. **Id.** (citation omitted).

In sum, the PCRA court did not have an opportunity to address Appellant's claim that PCRA counsel was ineffective or make a credibility determination as to the evidence that McWhite had been available and willing to testify, and we are unable to conduct proper appellate review. **See, e.g., Commonwealth v. Hand**, 252 A.3d 1159, 1165 (Pa. Super. 2021) (explaining that, "[w]ith the exception of the PCRA court's legal conclusions, our standard of review is deferential," and that the PCRA court's credibility determinations are binding on this Court). Therefore, we conclude that the best course of action is to vacate the March 27, 2024 order denying Appellant's PCRA petition and remand for the PCRA court to consider the claim Appellant has raised pursuant to **Bradley**.

On remand, we defer to the PCRA court as to the extent and manner of the additional evidence to be developed concerning Appellant's claim. Thereafter, the PCRA court shall enter a new final order disposing of all claims Appellant has raised in connection with the instant PCRA petition, after which any aggrieved party may seek appellate review.

Order vacated. Case remanded. Jurisdiction relinquished.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/21/2025